IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-01496-MSK-MEH

WATERSHED LLC,

       Plaintiff,

v.

COLUMBUS LIFE INSURANCE COMPANY,

       Defendant.

---

OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to Defendant Columbus Life Insurance Company's ("Columbus") Motion for Summary Judgment **(# 45)**, Plaintiff Watershed, LLC's ("Watershed") response **(# 66,** as supplemented **# 113)**, and Columbus' reply **(# 100**, as supplemented **# 146, # 147[1])**; Watershed's Motion for Summary Judgment **(# 48, 50)**[2], Columbus' response **(# 61)**, and Watershed's reply **(# 103);** Columbus' Motion to Strike the Declaration of Rayan Ebardo **(# 101)**, Watershed's response **(# 119)**, and Columbus' reply

---

[1]Docket # 147 is nominally a "Notice of Supplemental Persuasive Authority," although it also contains additional argument by Columbus as the significance of that authority.  Not surprisingly, that argument prompted Watershed to file a "response" **(# 148)**, containing its own argument.  As neither side requested an opportunity to supplement their arguments or file surreplies on this issue, the Court disregards in its entirety any argument contained in Docket #147 and 148, and considers only the actual Order tendered by Columbus.  For the reasons set forth herein, that Order has no bearing on the Court's analysis.

[2]Watershed filed what appears to be a standalone Motion for Summary Judgment **(# 48)**, followed by an identical copy of the same document along with certain exhibits under the docket text "Motion for Summary Judgment with partial exhibits." **(# 50)**

**(#1234)**; and Columbus' Motion to Strike the Declaration of Gary Chartier[3] **(# 102)**, Watershed's response **(# 118)**, and Columbus' reply **(# 125)**.[4]

## FACTS

The basic facts underlying this litigation are fairly simple. Columbus has issued a life insurance policy on Robert Altrogge. Watershed acquired the policy and is the beneficiary upon Mr. Altrogge's death. In 2008, Watershed failed to make the required premium payments on the policy, and on or about August 28, 2008, Columbus allegedly mailed a notice regarding the potential lapse of the policy to Watershed's address of record in Dubai. Watershed denies receiving a copy of this mailing. In November 2008, due to upon premiums, Columbus notified Watershed that the policy had terminated.

Watershed promptly sought to reinstate the policy, invoking a provision in the policy that permitted it to be reinstated "upon evidence of insurability satisfactory to [Columbus]." However, on December 23, 2008, Columbus declined to reinstate the policy, stating that it no longer underwrote policies for individuals over 80 years of age and at age 87, Mr. Altrogge was not eligible for insurance. Columbus later retracted its policies regarding insureds over 80 and in March 2009, agreed to consider an application for reinstatement of Mr. Altrogge's policy.

Although the parties contest the completeness of Watershed's application for reinstatement, it is sufficient to observe that Columbus denied the request for reinstatement on

---

[3]The Court discusses the motion directed at Mr. Chartier's declaration in its analysis. The Court need not reach the question of whether relief is necessary regarding Mr. Ebardo's declaration, and thus, the motion to strike that declaration is denied as moot.

[4]In addition, both sides have filed motions seeking to seal **(# 44, 53, 104, 109)** certain summary judgment exhibits.

two grounds: (i) that Mr. Altrogge was significantly overinsured by virtue of coverage under other life insurance policies; and (ii) his medical condition had declined to the point that Columbus was no longer willing to insure him.  Dissatisfied with these explanations, Watershed commenced this suit.

Watershed's Complaint (# 1) alleges five overlapping causes of action: (i) a request for a declaratory judgment to the effect that Columbus is contractually obligated to reinstate the policy; (ii) breach of contract, in that Columbus' refusal to reinstate the policy is in breach of the policy's terms; (iii) breach of the covenant of good faith and fair dealing, based on the same facts; (iv) a claim for bad faith breach of contract, apparently arising under *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354 (Colo. 1993) (recognizing tort of bad faith breach of insurance contract arising from insurer's refusal to renew policy); and (v) a "claim" for an injunction directing reinstatement of the policy.

Both parties now move for summary judgment.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

**B. Substantive motions**

Although the Court evaluates both parties' cross-motions separately, a unified discussion of those motions is appropriate here, as the undisputed facts material to each motion are the same and the parties' dispute primarily concerns the <u>significance</u> of such facts.

At the core of each of Watershed's claims is the essential requirement that Watershed demonstrate that Columbus has breached the contract between the parties. To establish a claim for breach of contract, Watershed must prove: (i) the existence of a valid agreement; (ii) Watershed's performance of its obligations under that agreement or some justification for nonperformance; (iii) Columbus' failure to perform its obligations under the agreement; and (iv) damages resulting from Columbus' nonperformance. *Saturn Systems, Inc. v. Militare*, 252 P.3d 516, 529 (Colo. App. 2011). The parties appear to agree that there was a valid contract between them, embodied by the insurance policy, and thus, Watershed has established the first element.

Next, the Court examines whether Watershed has performed its obligations under the

agreement, or, in the alternative, whether its performance of those obligations has been excused. As relevant here, Watershed had two primary contractual obligations: (i) to pay premiums on the schedule set by the policy; and (ii) if the policy lapsed, to "apply to reinstate the policy [and provide] evidence of insurability satisfactory to [Columbus]."

It is undisputed that Watershed did not pay the premiums as required in 2008 and that Columbus therefore deemed the policy to lapse. Although the parties have devoted a considerable amount of time and effort to arguments over the question of whether Columbus sent required premium and delinquency notices to Watershed – arguably an obligation that the policy imposed on Columbus – that question is irrelevant to Watershed's claims. The Complaint makes clear that the alleged breach of contract is Columbus' denial of Watershed's application for reinstatement, not a failure to provide notice of default and termination. *See e.g. Docket* # 1, ¶ 25 ("Columbus failed and refused to reinstate the Policy even though Watershed fully complied with the reinstatement provision"); ¶ 33 ("Columbus failed and refused to reinstate the Policy in accordance with the reinstatement provision"); ¶ 37 ("Columbus has breached the covenant of good faith and fair dealing . . . by . . . ignoring the plain language of the reinstatement provision").

The Court then turns to the reinstatement obligation under the contract. The contractual language here is brief:

> If . . . your policy terminates because You have not paid the needed premium, You may apply to reinstate the policy within five years . . . . The reinstatement is subject to evidence of insurability satisfactory to Us.

This language makes clear that before Columbus' obligation to reinstate the policy matures, Watershed must perform by tendering "evidence of insurability satisfactory to Columbus."

According to Columbus, Watershed's tender of evidence of Mr. Altrogge's insurability was unsatisfactory for two reasons: (i) he was overinsured; and (ii) his health condition had declined. Watershed contends that Columbus' invocation of each of these grounds is an unreasonable application of its discretion under the contract to demand "satisfactory" evidence of insurability. The parties agree that "evidence of insurability satisfactory to [Columbus]" is not policy language intended to have some peculiar meaning, and thus, cases such as *Bowie v. Bankers Life Co.*, 105 F.2d 806, 808 (10th Cir. 1939), that define that phrase to mean "evidence which would satisfy a reasonable person experienced in the life insurance business that the insured was in an insurable condition" are applicable. Thus, the factual question presented is whether Watershed's tendered proof of Mr. Altrogge's insurability was such that a reasonable person experienced in the life insurance business would have found it satisfactory.

Columbus' first ground for rejecting Watershed's application for reinstatement was that Mr. Altrogge was significantly overinsured relative to his net worth. Columbus explains that consideration of an insured's financial state is part of the underwriting analysis, as an individual who is significantly overinsured relative to his net worth – that he is "worth more dead than alive" – raises significant concerns for insurers. As a result, Columbus applies well-established underwriting criteria established by Swiss Reinsurance ("Swiss Re"). The Swiss Re guidelines provide that when insurance is sought for estate planning purposes, the appropriate presumptive limit of proper insurance coverage is 50% of the total value of the insured's net worth, assuming 7% growth of that net worth over the remainder of the insured's life expectancy. Given the variables applicable to Mr. Altrogge, this sum comes to approximately $ 6.8 million. Columbus indicates that, in evaluating Watershed's application, it learned that Mr. Altrogge maintained

numerous policies from other life insurers that, collectively, provided him with in excess of $ 17 million in coverage. Thus, Columbus concluded that reinstatement of the policy would violate its underwriting requirements.

In response, Watershed offers three major arguments: (i) Columbus was aware that Mr. Altrogge would have been overinsured by that definition at the time it issued the policy, and nevertheless proceeded to do so; (ii) that the overinsurance guidelines are not applicable in this situation; and (iii) the policy became incontestible due to misrepresentations by Mr. Altrogge two years after its issuance, precluding Columbus from now denying reinstatement based on facts not contained within Mr. Altrogge's initial application.

At the time Mr. Altrogge first sought the policy in 2005, he specifically disclosed only one life insurance policy issued by Pacific Life, having a death benefit of approximately $500,000. However, a document obtained by Columbus as part of its review of Mr. Altrogge's application indicated that Mr. Altrogge also had life insurance policy issued by Mass Mutual. Although the document did not disclose the policy's value, Columbus could have made inquiry and determined that the Mass Mutual policy provided approximately $ 7.5 million worth in benefits.[5] Keith Brown, Columbus' underwriter on Mr. Altrogge's 2005 application, testified that he was aware of the document, but he apparently overlooked the reference to the Mass

---

[5]In addition, Mr. Altrogge maintained an $ 8 million in life insurance coverage with other insurers. Watershed does not contend that Columbus had constructive knowledge of these policies' existence; instead it argues that had Columbus made additional inquiries, rather than simply relying on Mr. Altrogge's application, it would have discovered the existence of these policies. Watershed offers no evidence or authority indicating that Columbus was under any obligation to independently seek out information not included in Mr. Altrogge's representations. Thus, the Court does not consider the $ 8 million in additional coverage when evaluating Columbus' 2005 decision to insure Mr. Altrogge.

Mutual policy as he was primarily concerned with the document's representations as to how Mr. Altrogge planned to pay for the policy's premiums.

Watershed's argument as to the significance of these additional facts is somewhat unclear. As best the Court can ascertain, Watershed is arguing that because Columbus issued the policy in 2005 under circumstances that would have rendered Mr. Altrogge overinsured according to the Swiss Re formula, it was estopped from relying on those guidelines when considering Watershed's application for reinstatement. Watershed does not point to any authority supporting such an argument nor anything in the contract that suggests that this was the agreement of the parties. In absence of an agreement between the parties that limited Columbus' discretion (or law that precluded its exercise), Columbus was free to correct whatever mistake it had made in originally issuing the policy in the exercise of its discretion with regard to reinstatement.

Watershed's second argument regarding the issue of overinsurance is more complicated. First, it argues that its own insurance expert, Gary Chartier, opined that "an insurance company should not consider the total amount of coverage in force . . . when there are multiple applications at the same time." This appears to be an alarming mischaracterization of Mr. Chartier's actual testimony. The relevant exchange from Mr. Chartier's deposition is as follows:

> Q: So is it your opinion that reasonable insurance companies do not consider the total amount of coverage in force, when trying to figure out whether or not to issue an insurance policy for estate planning purposes?
>
> A: They do consider it. But they're a little bit more lenient than they are on the wage protection ratios.
>
> Q: That's not what this opinion appears to be saying here. So maybe that a great thing to clear up on the record. As I read your

>opinion, you seem to be stating that any consideration of a total amount of coverage would be improper. Is that your opinion?
>
>A: There can be a ratio. I didn't mean it to sound – I'm not sure if I – but to deny what they did deny was wrong.
>
>Q: We'll talk about that. I'm trying to figure out where you're coming from here. And I'll go back to my question to make sure I understand. Were you saying as sort of a bright line that an insurance company should not consider the total amount of coverage in force or sought to be placed in force concurrently, which can happen, right, where you have multiple applications out at the same time?
>
>A: Yes.
>
>Q: So the total amount of coverage, whether it's existing or sought to be added, that a life insurance company when looking at an estate planning case, should not consider these other amounts?
>
>A: They should look at the other amounts. They would look at the other amounts.
>
>Q: That's where I thought I was – you were losing me before. So in your opinion, they should look at these other amounts that are in force, right?
>
>A: Yes.

Watershed's argument appears to be based on Mr. Chartier's answer of "yes" to the compound question beginning "We'll talk about that . . . ." But it is obvious from the context that Mr. Chartier was not answering "yes" to the question "an insurance company should not consider the total amount of coverage . . ."; rather, he appears to be answering the secondary question of "[it] can happen, right, where you have multiple applications out at the same time," to which Mr. Chartier is answering "yes, [it can happen]." It is obvious from the context of the discussion and Mr. Chartier's other answers that he is emphatically not suggesting that an insurer is prohibited from considering potential overinsurance. Indeed, Mr. Chartier is clearly testifying that it is

10

appropriate for an insurer to consider that question. Thus, Watershed's suggestion to the contrary is flatly contradicted by Mr. Chartier's own testimony.

More importantly, Mr. Chartier's testimony on this point actually favors Columbus. Mr. Chartier testified that, in evaluating whether an individual is overinsured for estate planning purposes, insurance companies estimate the insured's net worth, then apply a variety of ratios to determine how much insurance would rise to the level of being overinsured in such circumstances. He states that "I've just seen it in a formula basis of half of the estate up to three times the estate. Everybody has different guidelines. They are really different." If, as Mr. Chartier acknowledges, insurance companies apply a range of ratios to determine overinsurance – some as low as the "half of the estate" ratio that the Swiss Re guidelines indicate – Columbus' decision to apply the Swiss Re ratio indicates that the criteria by which it measured Mr. Altrogge's insurability on Watershed's application were those that would fall within the range of reasonableness in the insurance industry.

Next, Watershed argues that the concept of overinsurance does not apply to situations where the insurance policy has been sold to an investor. The concern of overinsurance – making the insured "worth more dead than alive" – introduces an element of moral hazard, wherein it may be in beneficiaries' interests to hasten the insured's death or, at least, to avoid those actions that would prolong the insured's life. Watershed argues that in situations such as this one, where Mr. Altrogge has sold the policy to a disinterested third-party investor, the element of moral hazard is not present, as Watershed "has no control over [Mr. Altrogge]" nor over whether Mr. Altrogge will thereafter obtain additional insurance policies. The sole evidence cited by

Watershed for this proposition is an affidavit by Mr. Chartier.[6] His affidavit states that "It is also my opinion that over-insurability is not an issue with respect to life insurance policies sold to persons unrelated to the insured . . . ." But beyond stating that this is Mr. Chartier's opinion (and supplying the reasoning set forth above as to why Mr. Chartier holds that opinion), the affidavit establishes nothing; notably, it does not state that his opinion is one that is shared by the insurance industry in general, that it is derived from any particular observations Mr. Chartier has made about the practices in the insurance industry, or that it is considered unreasonable in the industry for an insurer to consider overinsurance in this context.[7] Without evidence that

---

[6]Columbus has moved to "strike" Mr. Chartier's affidavit on two grounds: (i) that it constitutes untimely supplementation of Watershed's disclosure of expert opinions, although the motion does not clearly identify which portions of the affidavit are improper on this basis; and (ii) that the affidavit attempts to disclaim certain portions of his deposition testimony relating to Mr. Altrogge's medical records. The Federal Rules of Civil Procedure do not contemplate "striking" of anything other than a pleading, Fed. R. Civ. P. 12(f) ("the court may strike from a pleading [various matters]"); 7(a) (defining "pleadings"). In actuality, the remedy Columbus requests is simply that the Court not consider the offending material pursuant to Fed. R. Civ. P. 56(c)(2). Although the Court finds Columbus' motion is unsupported with regard to the question of whether Mr. Chartier's affidavit untimely discloses supplemental opinions, the Court need not address that question because, as the analysis explains, the Court does not find Mr. Chartier's statements in the relevant portion of the affidavit to create a genuine issue of fact. Thus, the Court does not reach the "motion to strike."

[7]In addition, Mr. Chartier's opinion seems to assume a central premise that is not otherwise established. He acknowledges that an insurer should consider overinsurance when evaluating an application for insurance by the insured himself or persons having involvement with the insured, but opines that overinsurance is "not an issue" when the applicant is a third-party with no direct connection to the insured. Implicit in this opinion is an assumption that Columbus' underwriting standards should vary depending on the status of the person applying for the insurance, but Mr. Chartier's affidavit does not address whether this is indeed the case in the insurance industry.

Indeed, if anything, Watershed's argument suggests the opposite, or at the very least, takes conflicting positions as to how Columbus should treat Watershed's request for reinstatement of the policy. On the one hand, it could be said that Watershed's request should be judged by the same criteria that would apply were Mr. Altrogge applying for (or perhaps renewing) the policy himself; on the other hand, it could be said that the request should be

Columbus' consideration of Mr. Altrogge's potential overinsurance was something that no reasonable insurer would have done, Mr. Chartier's personal opinion does not support Watershed's claims.

Finally, Watershed argues that Columbus cannot invoke concerns of overinsurance because Mr. Altrogge's policy became "incontestable." The policy contains language providing that, once two years have elapsed from the policy's issuance, Columbus may not attempt to contest the validity of the policy based on misstatements by Mr. Altrogge in his application for insurance. In other words, if Columbus did not discover that Mr. Altrogge had not fully disclosed the extent of his other insurance policies in his application within two years from the inception of the policy, Columbus was barred from later contesting the validity of the policy on that basis. Watershed argues that it too enjoys the benefits of that incontestability provision, insofar as Columbus' "overinsured" justification is essentially an argument premised on misstatements in Mr. Altrogge's initial application.

The Court finds this argument to be without merit for several reasons. First, it is based on a faulty premise. Columbus' current determination that Mr. Altrogge is overinsured is not a

---

judged by criteria recognizing that Watershed is distinct and unaffiliated with Mr. Altrogge (that is, that Watershed's application is a third-party purchase of insurance). Watershed appears to adopt the former notion when arguing that it enjoys the benefits of the two-year incontestability provision in the same way that Mr. Altrogge would have if he were the applicant. *See infra.* Yet Watershed appears to adopt the latter notion in arguing that questions of overinsurance and moral hazard are not present because Watershed is not connected to Mr. Altrogge.

     This latter proposition becomes even more troubling when one considers Mr. Chartier's explanation that third-party purchases of insurance raise additional concerns of "stranger-originated life insurance" that is purchased by one with no insurable interest in the insured and solely as a vehicle for speculation. Watershed seeks to invoke its third-party status in arguing that concerns of overinsurance should not be entertained when evaluating its request for reinstatement, but it fails to grapple with how that third-party status bears on the "stranger originated life insurance" question.

decision that seeks to invalidate the policy on the basis of a misstatement by Mr. Altrogge in his <u>initial</u> application. Columbus' position has nothing to do with Mr. Altrogge's initial application. Were that the case, the provision in the contract that authorized Columbus to evaluate the evidence of insurability submitted by Watershed in its application to reinstate would be meaningless.

Essentially, Watershed's request to reinstate is akin to an application for a brand-new policy. The policy requires that, upon a request to reinstate, evidence of the insured's continuing insurability must be provided. By definition, this evidence relates to the insured's <u>current</u> condition, not to the condition the insured may have been in at the time the policy was initially issued; otherwise, there would be no purpose served by submitting evidence of the insured's initial insurability a second time. Thus, in considering Watershed's request for reinstatement, Columbus was evaluating the evidence it <u>currently</u> had regarding Mr. Altrogge, not the evidence it had from Mr. Altrogge's initial application. Because the information considered included substantially more insurance coverage that had previously been known, Columbus was entitled to decline reinstatement to Watershed, even though it could not have contested an unlapsed policy on the same grounds. *See also Spencer v. Kemper Investors Life Ins. Co.*, 764 P.2d 408, 411-12 (Colo. App. 1988) (adopting majority view that "time limits in the incontestability clause run anew as to matters affecting the validity of the reinstatement . . . Any other view would open the door to the grossest deceit and fraud in securing the reinstatement of a policy that had become incontestable under its original provisions").[8]

---

[8]Watershed attempts to distinguish *Spencer* by arguing that the policy language there expressly excluded "non-payment of premiums" from the scope of the incontestability provision, whereas no such exclusion appears in Columbus' policy. This distinction is immaterial. By

Second, Watershed's argument misstates the actual policy language. Page 21 of the policy states "We will not contest this policy with respect to statements made <u>in an application for reinstatement</u> after the policy has been in effect . . . for two years <u>from the effective date of the reinstatement</u>." (Emphasis added.) This language makes clear that, when reinstatement of a lapsed policy is sought, statements made in the reinstatement application do not enjoy the benefits of any incontestability that may have arisen simply because the policy had previously been in effect for more than two years. Rather, this language makes clear that statements in the reinstatement application are themselves subject to a new two-year incontestability clock that begins running once the reinstatement is made. Watershed can make no colorable claim to relief under this clearly-applicable provision.

Mr. Chartier's affidavit addresses the incontestability issue, stating that "it is my opinion that this provision does not apply to reinstatement of the policy." Once again, Mr. Chartier's affidavit purports to express only Mr. Chartier's own opinion, and it does not indicate whether that opinion is one that is commonly-held in the insurance industry. Mr. Chartier's reasons for

---

definition, every insurance contract is contestable at all times based on non-payment of premiums; indeed, payment of premiums is usually the insured's only duty under the contract and the insured's failure to discharge that duty permits the insurer to contest its remaining obligations. Moreover, by definition, a policy will not require reinstatement unless it has been prematurely terminated, again, likely due to non-payment of premiums. Thus, an insurer's rights under a policy are the same whether there is an express exclusion for non-payment of premiums under the incontestability term or whether no such exclusion appears.

Moreover, Watershed misreads the terms of Columbus' contract, which are qualitatively different from those in *Spencer*. The policy in *Spencer* had a broad incontestability provision – "This policy shall be incontestable" for apparently any reason – constrained by a single exception (non-payment of premiums). Columbus' contract, on the other hand, contains an incontestability provision that narrowly identifies only those categories of contests that Columbus agrees not to raise – " we will not contest this policy <u>with regard to statements made in an application</u> . . ."). Because Columbus' provision is narrow and specific, there is no reason why it would need to include an exception for non-payment of premiums.

holding this opinion make no reference to particular practices in the insurance industry nor industry standards for reviewing policy applications. It is nothing more than a conclusion proffered by Mr. Chartier with no particular explanation of its underlying basis. Moreover, the Court has some doubt that this is even a subject upon which Mr. Chartier can render an admissible opinion. The contention that a particular contractual term is or is not applicable to a given factual situation is a question of law. Mr. Chartier is not permitted to express opinions on issues of law. *Specht v. Jensen*, 853 F.2d 805, 807-09 (10th Cir. 1988) ("it was error for the trial court to allow [an expert] to render his opinions on the legal obligations arising from a contract").

The Court finds that there is no genuine dispute of material fact with regard to Columbus' decision not to reinstate the policy because of Mr. Altrogge's overinsuredness. Based on the undisputed facts, Watershed cannot carry its burden of showing that Columbus' denial of reinstatement on this ground was an unreasonable application of underwriting standards common in the insurance industry. Thus, Columbus did not breach the contract in denying reinstatement, entitling it to summary judgment on all of Watershed's claims.

Because the preceding analysis regarding overinsurance is a complete and independent justification for Columbus' decision, the Court need not reach the question of whether Columbus' conclusion that Mr. Altrogge's medical condition warranted denial of the application for reinstatement was reasonable.

### C. Motions to Seal

Both sides moved to seal a variety of exhibits to their summary judgment motion, arguing that the exhibits – medical records relating to Mr. Altrogge – invoked matters of private concern

that outweighed any public interest in access to court records.

Although the Court strongly doubts that sealing the documents would have been appropriate had the Court addressed the medical justification give by Columbus for the denial of reinstatement,[9] the Court finds that the documents may remain under seal for a different reason. In *Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 755 (10th Cir. 2009) (unpublished), the 10th Circuit recognized that the strong public interest in access to judicial records is greatly diminished, if not outright vitiated, where the Court does not actually consider and rely upon the documents in reaching its determination.  Because the Court did not consider the parties' arguments with regard to Mr. Altrogge's medical records, and did not base its decision in any way upon consideration of those records, there is a minimal public interest in having access to those records.  In such circumstances, Mr. Altrogge's privacy interest in keeping details of his medical condition private is sufficient to outweigh the minimal public interest and permit the documents to be maintained under seal.   Accordingly, the motions to seal are granted.

## CONCLUSION

For the foregoing reasons, both parties' Motions for Summary Judgment **(# 45, 48, 50)** are granted, in the sense that the Court finds that there is no genuine dispute of fact requiring trial, and further, that summary judgment is **GRANTED** to Columbus on all claims in this action. Columbus' Motion to Strike the Declaration of Rayan Ebardo **(# 101)** and Columbus' Motion to Strike the Declaration of Gary Chartier **(# 102)** are **DENIED AS MOOT**.  The parties' Motions to Seal **(# 44, 53, 104, 109)** are **GRANTED**, and all documents filed under

---

[9]The Court notes that the parties' concern for Mr. Altrogge's privacy is particularly surprising insofar as they discuss his medical condition in extensive detail in their briefs, yet those briefs were not filed under seal and are fully open to public inspection.

provisional seal shall remain sealed.  The Clerk of the Court shall enter judgment in favor of Columbus on all claims.

Dated this 10th day of September, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge